Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/07/2022 09:06 AM CDT

State of Nebraska, appellee, v.
Douglas H. Anders, appellant.
___ N.W.2d ___

Filed July 15, 2022.    No. S-21-413.

1. **Effectiveness of Counsel: Appeal and Error.** Assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege deficient performance, and an appellate court will not scour the remainder of the brief in search of such specificity.
2. **Convictions: Appeal and Error.** In an appeal of a criminal conviction, an appellate court reviews the evidence in a light most favorable to the prosecution.
3. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.
4. **Trial: Convictions: Evidence: Appeal and Error.** An appellate court will sustain a conviction in a bench trial of a criminal case if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support that conviction. In making this determination, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented, which are within a fact finder's province for disposition. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
5. **Sexual Assault: Testimony: Proof.** The State is not required to corroborate a victim's testimony in cases of first degree sexual assault; if believed by the finder of fact, the victim's testimony alone is sufficient.
6. **Witnesses: Appeal and Error.** It is not in the purview of the appellate court to determine the credibility of witnesses on appeal, as such determinations are for the finder of fact.

7. **Statutes: Intent.** When interpreting a statute, the starting point and focus of the inquiry is the meaning of the statutory language, understood in context.

8. **Statutes: Appeal and Error.** Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.

9. **Statutes.** It is not within the province of the courts to read meaning into a statute that is not there or to read anything direct and plain out of a statute.

10. **Sexual Assault.** Under Neb. Rev. Stat. § 28-318(8)(a)(iv) (Cum. Supp. 2020), a victim does not consent to sexual penetration if the consent, if any was actually given, was the result of the actor's deception as to the nature or purpose of the act on the part of the actor.

11. **Sexual Assault: Words and Phrases.** The word "deception," as used in Neb. Rev. Stat. § 28-318(8)(a)(iv) (Cum. Supp. 2020), has a plain and ordinary meaning: words or conduct, or both words and conduct, causing the victim to believe what is false.

12. **Criminal Law: Statutes: Appeal and Error.** In strictly construing penal statutes, an appellate court does not supply missing words or sentences to make clear that which is indefinite, or to supply that which is not there.

13. **Convictions: Evidence: Appeal and Error.** Where there is sufficient evidence to support a conviction under one theory of guilt, an appellate court need not consider whether the evidence was sufficient to support the alternative theory or theories of guilt.

14. **Effectiveness of Counsel: Postconviction: Records: Appeal and Error.** When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.

15. **Effectiveness of Counsel: Records: Appeal and Error.** The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question.

16. **Effectiveness of Counsel: Proof.** Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.

17. ____: ____. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

18. **Effectiveness of Counsel: Proof: Words and Phrases.** To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

19. **Trial: Effectiveness of Counsel: Presumptions: Appeal and Error.** In determining whether trial counsel's performance was deficient, there is a strong presumption that counsel acted reasonably.

20 **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

21. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

22. **Constitutional Law: Criminal Law: Jury Trials: Appeal and Error.** Whether cumulative error deprived a criminal defendant of his or her Sixth Amendment right to a trial by an impartial jury presents a question of law to be reviewed de novo.

23. **Appeal and Error.** An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.

24. **Effectiveness of Counsel.** A pro se party is held to the same standards as one who is represented by counsel.

25. **Trial: Attorneys at Law.** The decision whether or not to object has long been held to be part of trial strategy.

26. **Effectiveness of Counsel: Trial.** When reviewing claims of alleged ineffective assistance of counsel, trial counsel is afforded due deference to formulate trial strategy and tactics.

27. **Effectiveness of Counsel: Presumptions: Appeal and Error.** There is a strong presumption that counsel acted reasonably, and an appellate court will not second-guess reasonable strategic decisions.

28. **Constitutional Law: Jury Trials: Appeal and Error.** Although one or more trial errors might not, standing alone, constitute prejudicial error, their cumulative effect may be to deprive the defendant of his or her constitutional right to a public trial by an impartial jury.

29. **Trial: Evidence: Presumptions: Appeal and Error.** In a case tried to the court without a jury, there is a presumption that the trial court, in

reaching its decision, considered only evidence that is competent and relevant, and this court will not overturn such a decision where there is sufficient material, competent, and relevant evidence to sustain the judgment.

30. **Sentences: Appeal and Error.** A sentence imposed within the statutory limits will not be disturbed on appeal in the absence of an abuse of discretion by the trial court.

31. **Constitutional Law: Criminal Law: Sentences.** The constitutional protection against cruel and unusual punishment does not require strict proportionality between crime and sentence, but, rather, forbids only extreme sentences that are grossly disproportionate to the crime.

Appeal from the District Court for Douglas County: Timothy P. Burns, Judge. Affirmed.

Douglas H. Anders, pro se, and Timothy S. Noerrlinger for appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein, for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Cassel, J.

## I. INTRODUCTION

Douglas H. Anders appeals from his conviction and sentence for first degree sexual assault. At the conclusion of a bench trial, the court found that Anders exploited his position as K.G.'s Olympic trainer and sexually penetrated her through deception and coercion. Anders primarily challenges the sufficiency of the evidence to support his conviction. He also asserts that his sentence was excessive and that his trial counsel was ineffective. Finding no merit to his appeal, we affirm.

## II. BACKGROUND

The State charged Anders with first degree sexual assault, a Class II felony, pursuant to Neb. Rev. Stat. § 28-319(1) (Reissue 2016). The State alleged that Anders sexually

penetrated K.G. under the guise that it was necessary to aid in her physical recovery from athletic training.

A bench trial was held where the State and Anders offered evidence. In this section, we summarize testimony and facts pertinent to the instant appeal, viewed in the light most favorable to the State. In the analysis section below, we provide additional facts where necessary.

## 1. State's Evidence

The State offered the testimony of multiple witnesses, including K.G., K.G.'s therapist, K.G.'s friends and family, M.C. (another woman who testified that she was sexually assaulted by Anders), and criminal investigators.

### (a) K.G.'s Testimony

K.G. testified that Anders trained her at his commercial gym to become an Olympic weightlifter. During K.G.'s training, Anders performed "adjustments" to her, claiming that they would alleviate the pain and soreness she felt in her pelvis and legs. Anders would "adjust" K.G. by inserting his fingers into her vagina while she lay on a chiropractic bed.

K.G. testified that she was not yet 16 years old the first time that Anders performed an "adjustment" on her. K.G. remembered that her mom "pick[ed her] up" from the gym that day, because she "couldn't drive" yet. Anders was 35 years her senior. K.G. was uncomfortable and embarrassed by Anders' actions, but she did not protest, because she trusted him and wanted to alleviate her pain.

Anders convinced K.G. to not tell anyone about the "treatment," because he claimed that although it was commonplace in the sports world, it was "taboo" to talk about it to others. Accordingly, K.G. generally kept Anders' conduct a secret while under his training. K.G. never went to law enforcement and only discussed being sexually penetrated by Anders with a friend and her former boyfriend.

Anders' "adjustments" progressed into what he called "sports massage[s]," where he would rub K.G.'s inner thighs. Anders

told K.G. that there was a muscle in her thigh that was affecting the way her foot turned while lifting and that the "sports massage" was necessary to increase blood flow. These massages ended with Anders' touching K.G.'s genital area. K.G. testified that Anders would often have an erection while massaging her. Again, K.G. was uncomfortable; but because she believed his explanation, she did not protest.

Anders' conduct advanced further. Eventually, Anders started inserting foreign objects into K.G.'s vagina to "stimulat[e]" recovery. This progressed over time to penetrating her vagina with his penis.

K.G. testified that she initially "refuse[d] any type of penetration by [Anders] and, usually, that was a boundary that was pushed." According to K.G., no matter how many times she protested being sexually penetrated by Anders, he would insist that it was necessary for her "recovery" until she just "caved and just submitted to [it]."

Several times, K.G. expressed her desire that the touching "not be part of the training" and that she "still want[ed] to be an athlete and do weightlifting[,] but [she didn't] want to continue with the other stuff." However, when K.G. would bring this desire to Anders, he would get upset and threaten to stop training her or kick her out of his gym until she begged him to return. K.G. always begged to return, because Anders had manipulated her into believing that she would not achieve her Olympic dreams if he did not train her.

K.G. testified that Anders manipulated her in other ways as well. Anders isolated K.G. from her social life and demanded that she focus her attention on training. Anders told K.G. that she needed to "get more focused, more serious" about her training and "[could not] necessarily go out Friday nights because [she] had to be in the gym to train on Saturday." When K.G. was not at his gym, Anders would text her, asking if she was "'home yet.'" Consequently, K.G. stopped socializing with her friends, because she "had to be serious and focused." It came to the point where she would

"first ask him if [she] could go." K.G. also began working at the gym.

Anders' actions became "less adjustment, less massage, more just intercourse whenever he wanted, whenever it was convenient, whenever there was an opportunity." K.G. testified that the sexual intercourse became such a "normal part of [her] being at the gym" that she would initiate it with Anders on occasion.

After 8 years, K.G. finally stopped training under Anders and permanently left the gym. K.G. then told her parents that Anders had been sexually abusing her and sought therapy.

Anders' conduct was finally brought to the attention of law enforcement when K.G.'s therapist complied with his legal obligation to report sexual abuse to authorities. After law enforcement launched an investigation into Anders, K.G. talked to investigators and gave them the cell phones that she used during and after her time at Anders' gym.

### (b) M.C.'s Testimony

M.C. testified to similar conduct by Anders directed toward her. M.C. also trained and worked at Anders' gym. M.C. claimed that he had sexually assaulted her.

Before trial, Anders filed a motion in limine to bar M.C. from testifying under Neb. Rev. Stat. § 27-414 (Reissue 2016). The court held a hearing where M.C. testified regarding those events. After the hearing, the court overruled Anders' motion in limine and allowed M.C. to testify at trial. At trial, Anders did not renew his objection when the State called M.C. to testify.

At trial, M.C. testified that Anders performed some "adjustments or chiropractic measures" on her for pain that she was suffering. Anders never inserted his fingers into M.C.'s vagina during these sessions. However, M.C. suffered a broken tailbone at one point in her training and Anders claimed he could "fix [her] broken tailbone" by inserting his fingers into her vagina to "correct" it.

M.C. was skeptical of Anders' claim, because he was not a doctor. Anders responded to M.C.'s skepticism by asking to do an initial examination on her to see if treating her tailbone was "even possible."

After M.C. agreed to the initial procedure, Anders placed his hands on her inner thigh near her genital areas, moved his hands up to "where [her] leg connects to [her] pelvis," and moved his hands over her breasts before ending the procedure. Anders informed her that he could "fix" her tailbone, but M.C. told him she needed time to think it over.

However, M.C. never decided whether to consent to Anders' "treatment," because she was permanently "kicked out of the gym." A few days after Anders' examination of M.C., K.G. confronted her about arriving late to the gym. M.C. discussed the matter with K.G. in a private room, where she explained she believed Anders was manipulating K.G. Anders then "burst in" the room and told M.C., "that's it, you're out." M.C. left and never went back to the gym.

### (c) Investigators' Testimony

The State called multiple investigators to detail their investigation into Anders and the collection of evidence presented in the case. Some of the most notable testimony by the investigators regarded K.G. and Anders' cell phone communications.

An investigator testified to receiving phone records from K.G.'s phone carriers and recovering two phones from K.G. and one phone from Anders. The phone carriers' records listed K.G.'s phone number and stated that 62.56 percent of all communications to K.G.'s phone number were either to or from Anders' phone number. Anders provided the investigator with his number.

A second investigator testified that he used computer software to download text messages from two phones owned by K.G. and one phone owned by Anders. The phones matched K.G.'s and Anders' phone numbers. The investigator explained that some text messages could not be retrieved, because they

had been deleted. However, the investigator was able to recover some messages that were marked for deletion but had not yet been removed from the phones' databases.

The State introduced the text messages that investigators recovered as exhibits. As an example, Anders texted K.G. that "I need some," to which she responded, "I'd give some but my tailbone [is] sore." Another text Anders sent to K.G. stated, "No candy touching my LIPS . . . UNLESS [it's] ON YOURS." Yet another text message included K.G.'s mentioning taking a nap with Anders after "bang[ing]."

### (d) Other Witnesses

K.G.'s friend and her former boyfriend testified that while K.G. was still training under Anders, she told them about his sexual abuse. K.G.'s father also testified. While K.G.'s father was not aware of the sexual abuse until after she left the gym, he confirmed her general timeline of events (her training schedule, the amount of time she spent at the gym, her informing him of the abuse after she permanently left the gym, her decision to seek counseling, et cetera). Further, Anders' ex-business partner testified that he saw Anders and K.G. kissing in the gym's spa area.

At the conclusion of the State's case, Anders moved to dismiss the charge against him, arguing the State failed to provide sufficient evidence to support his conviction. The court overruled Anders' motion.

### 2. Anders' Defense

Anders testified in his defense and presented multiple witnesses.

### (a) Anders' Testimony

Anders denied ever performing any sexual acts on K.G. or M.C. and attacked the credibility of the State's witnesses. Anders asserted that K.G. had mental issues that caused her to fabricate her allegations, claiming that she made them up after seeing reports that a doctor who was associated with

U.S. "gymnastic programs that were Olympic-certified" had sexually abused female athletes. Anders acknowledged that he was not qualified to make any medical response to a medical report. Nevertheless, he contended that he had obtained tests results from K.G.'s blood showing she was schizophrenic. (Anders did not introduce the test results or the testimony of the clinical psychologists with whom he claimed to have discussed her test results.) Further, Anders insisted that K.G.'s friend and her former boyfriend were lying that she informed them of his sexual abuse years before the reports against the Olympic doctor came to light. Anders also asserted the M.C. was lying and had mental issues.

Anders attempted to explain away many of the text messages that investigators retrieved from his and K.G.'s phones. For instance, Anders claimed that the "candy touching [my] lips" message was regarding candy-flavored lip balm that he was using to treat a cold sore. Anders also asserted that K.G. could not have been talking about him in the message that referred to taking a nap after "bang[ing]," because he never napped in the office. Regarding other messages, he simply denied ever sending or receiving them.

Finally, Anders claimed that his ex-business partner misinterpreted the kiss that he gave K.G. Anders stated he "kissed [K.G.] on the cheek" after she "missed . . . a personal best." Anders maintained that he would regularly do the same thing for any of his clients—including men.

(b) Character Witnesses

Anders presented multiple witnesses who either worked at or attended his gym. The witnesses testified that they never saw Anders sexually abuse K.G. and did not believe he would do so based on their interactions with him. However, when confronted with K.G.'s and Anders' text messages, the witnesses were surprised and could not reasonably justify the text messages' explicit contents.

After resting Anders' case, his trial counsel renewed his motion to dismiss. The court overruled the motion.

### 3. Verdict and Sentencing

Acting as the trier of fact, the court found Anders guilty of one count of first degree sexual assault. The court stated that Anders and K.G. had a lengthy sexual history in which he sexually penetrated her without her consent on multiple occasions "through coercion, at times it was through deception, and at times it was through both coercion and deception." The court also made explicit witness credibility determinations, finding K.G. credible and Anders not credible. Anders filed a motion for new trial, which the court overruled.

At Anders' sentencing hearing, the court listened to K.G.'s victim statement and reviewed the presentence investigation report. The court then stated to Anders:

> [I]t's very disturbing that you were 50 or so when [K.G.], a teenager — and you started a sexual relationship with her. You were in a position of authority, command, influence, and yet you manipulated and isolated her. Despite overwhelming evidence of your guilt, your only response to the conviction is, I did not have any sexual contact with [her].

The court sentenced Anders to a term of 25 to 30 years' imprisonment.

Anders filed a timely appeal and a petition to bypass the Nebraska Court of Appeals. We denied Anders' petition to bypass, but moved the case to our docket.[1]

### 4. Changes in Counsel

Anders has changed his counsel three times during the course of his proceedings: (1) before trial; (2) after the court issued its verdict, but before Anders was sentenced; and (3) after Anders' notice of appeal was filed, but before oral arguments

---

[1] See Neb. Rev. Stat. § 24-1106(2) and (3) (Cum. Supp. 2020).

were presented. In total, Anders was represented by three different trial counsel and two appellate counsel. Because Anders assigns ineffective assistance of counsel, we clarify the time periods during which each counsel represented him.

Anders retained his initial counsel—who represented him during the discovery portion of his proceedings, including the depositions of K.G. and her mother. Anders terminated his initial counsel and retained his primary counsel. The court sustained Anders' initial counsel's motion to withdraw.

Anders' primary counsel represented him during the remainder of the discovery proceedings and at trial. At Anders' sentencing hearing, Anders "releas[ed]" his primary counsel from representing him. The court allowed Anders' primary counsel to withdraw.

Anders then retained his postverdict counsel, who presented arguments in support of his motion for new trial, represented him at his sentencing hearing, and filed his notice of appeal. By filing Anders' notice of appeal, his postverdict counsel became his appellate counsel. However, Anders filed a pro se "Notice of Termination of Appellant's Counsel" with the Court of Appeals, stating that he notified his counsel that he was "terminat[ed] effective[] immediately" and intended to retain new appellate counsel. Anders' postverdict counsel filed a motion to withdraw, which the Court of Appeals held under advisement and directed the counsel to file a motion to withdraw with the district court. Anders' postverdict counsel then filed a motion to withdraw with the district court, which the court sustained. After receiving a supplemental transcript, the Court of Appeals reconsidered and sustained Anders' postverdict counsel's motion to withdraw.

Anders filed his appellate brief and petition to bypass pro se. Anders then retained new appellate counsel—who entered a written appearance, filed a reply brief, and presented oral argument to this court. At oral argument, appellate counsel explained that he was retained "to orally argue the [appeal] for [Anders]." However, we observe that appellate

counsel's written appearance did not specify a limited scope of representation.[2]

After oral arguments were presented, and while the appeal was under submission, Anders filed a written notice that he had discharged his appellate counsel. In that notice, he reiterated his reliance upon the assignments of error in his pro se brief.

## III. ASSIGNMENTS OF ERROR

Anders assigns three categories of error, which we combine and restate. Anders assigns that the evidence was insufficient to support his conviction. He also assigns that he received an excessive and unconstitutional sentence. Finally, Anders assigns that he received ineffective assistance of trial counsel.

[1] We have held that assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege deficient performance, and an appellate court will not scour the remainder of the brief in search of such specificity.[3] Therefore, we quote Anders' assignments of error regarding ineffective assistance of counsel.

Anders assigns his trial counsel was ineffective in:

A. Failing to insist upon expert testimony as to psychological coercion[;]

B. Failing to argue [sic] reliance upon deception as to the nature or purpose of a sexual act must be objectively reasonable[;]

C. Failing to object to inadmissible single, double, and triple hearsay[;]

D. Failing to object to unreliable testimony by [M.C.] as to an allegedly prior bad act that was dissimilar, did not constitute a crime of sexual assault under [Neb. Rev. Stat. § 27-413 (Reissue 2016)], and was unduly prejudicial under [Neb. Rev. Stat. § 27-403 (Reissue 2016);]

E. Fail[ing] to impeach [his ex-business partner] about his previous felony convictions, to object to his testimony

---

[2] See Neb. Ct. R. of Prof. Cond. § 3-501.2(d) (rev. 2016).

[3] *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019).

as improper evidence of prior bad acts, to object to defense witnesses being questioned about [his] testimony, and the financial windfall [he] would derive from [Anders'] being convicted[;]

F. Failing to object to inadmissible text messages from [Anders'] and [K.G.'s] cell phones[;]

G. Fail[ing] to cross examine [K.G.] about the inconsistent time periods of [Anders'] alleged misconduct between her trial testimony and previous sworn statements[;]

H. Fail[ing] to seek the counseling records of [K.G.'s therapist] under [*State v. Trammell*,[4]] to cross examine [him] thereon, and to retain a defense expert to determine and testify if [K.G.] was suffering from false memory syndrome, and whether or not [K.G.'s] reliance upon any deception by [Anders] was reasonable and/or a result of psychological coercion.

Anders also assigns his trial counsel's "collective ineffectiveness in failing to object to prejudicial inadmissible evidence constitutes plain error under the cumulative error doctrine."

## IV. STANDARD OF REVIEW

[2,3] In an appeal of a criminal conviction, we review the evidence in a light most favorable to the prosecution.[5] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[6] Additional standards will be set forth in the analysis section.

## V. ANALYSIS

### 1. Sufficiency of Evidence

Anders assigns that the court erred in finding that there was sufficient evidence to support his conviction for first degree sexual assault. Anders presents two arguments. First, he argues

---

[4] *State v. Trammell*, 231 Neb. 137, 435 N.W.2d 197 (1989).

[5] *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021).

[6] *Id*.

the evidence was insufficient to prove that he sexually penetrated K.G., because the court should not have considered her testimony. Anders also argues the evidence was insufficient to prove that he induced K.G.'s consent through deception or compelled her to submit through coercion. Each will be addressed in turn.

### (a) Standard of Review

[4] An appellate court will sustain a conviction in a bench trial of a criminal case if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support that conviction. In making this determination, we do not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented, which are within a fact finder's province for disposition. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[7]

### (b) Statutes

Section 28-319(1) creates the offense at issue here. It states: "Any person who subjects another person to sexual penetration . . . without the consent of the victim . . . is guilty of sexual assault in the first degree."[8]

For purposes of that offense, Neb. Rev. Stat. § 28-318 (Cum. Supp. 2020) defines "[s]exual penetration" and "[w]ithout consent." This definitional statute states in part:

(6) Sexual penetration means *sexual intercourse* in its ordinary meaning, . . . , or any *intrusion*, however slight, of *any part of the actor's* or victim's *body* or any object manipulated by the actor *into the genital* or anal openings of the victim's body which can be reasonably construed as being for nonmedical, nonhealth, or nonlaw enforcement

---

[7] *State v. Taylor*, 310 Neb. 376, 966 N.W.2d 510 (2021).

[8] § 28-319(1).

purposes. Sexual penetration shall not require emission of semen.

. . . .

(8) Without consent means:

(a)(i) The victim was compelled to submit due to the use of force or threat of force or *coercion*, or (ii) the victim expressed a lack of consent through words, or (iii) the victim expressed a lack of consent through conduct, or (iv) *the consent, if any was actually given, was the result of the actor's deception as to* the identity of the actor or *the nature or purpose of the act on the part of the actor*;

(b) The victim need only resist, either verbally or physically, so as to make the victim's refusal to consent genuine and real and so as to reasonably make known to the actor the victim's refusal to consent[.][9]

### (c) Discussion

#### (i) K.G.'s Testimony

Anders' first sufficiency argument asserts that the court should not have considered K.G.'s testimony, because it was "uncorroborated and materially inconsistent."[10] And without K.G.'s testimony, he argues, the evidence was insufficient to support his conviction.

Anders acknowledges that Neb. Rev. Stat. § 29-2028 (Reissue 2016) "did away with the [victim] corroboration requirement in sexual assault cases."[11] However, Anders asserts that § 29-2028 should not apply when the victim's testimony is inconsistent with prior statements. Anders alleges that K.G.'s trial testimony was materially inconsistent with the affidavit she used to seek a protection order against him and with her pretrial deposition. In that testimony, Anders claims, K.G. stated that he never sexually penetrated her before her 16th birthday.

---

[9] § 28-318(6) and (8) (emphasis supplied).

[10] Brief for appellant at 33.

[11] *Id.*

Although K.G.'s deposition appears in our record, her protection order application does not. But Anders' argument fails for two more basic reasons.

[5] First, it contradicts the corroboration statute. Since 1989, the State has not been required to corroborate a victim's testimony in cases of first degree sexual assault; if believed by the finder of fact, the victim's testimony alone is sufficient.[12]

[6] Second, it disregards our standard of review. It is not in the purview of the appellate court to determine the credibility of witnesses on appeal, as such determinations are for the finder of fact.[13] We decline to resolve evidentiary conflicts, pass on witness credibility, evaluate explanations, or reweigh the evidence.

### (ii) Without Consent

Anders' second insufficiency argument relies upon the statutory definitions of the phrase "without consent." Anders argues the evidence was insufficient to prove that he induced K.G.'s consent through deception or compelled her to submit through coercion.

Because the first time that Anders sexually penetrated K.G. was after he claimed he needed to do so to "adjust" her pelvis, we begin with deception.

### a. Deception

Anders argues there was insufficient evidence to prove that he used deception to sexually penetrate K.G. He contends that his statements—expressing a purpose to sexually penetrate K.G. to "aid her physical recovery from workouts"[14]—were not deceptive, because it was not "objectively reasonable" for her to believe that was the purpose of his conduct.[15] Anders' argument requires this court to interpret § 28-318(8)(a)(iv).

---

[12] *State v. Mrza, supra* note 3.

[13] See *State v. Price*, 306 Neb. 38, 944 N.W.2d 279 (2020).

[14] Brief for appellant at 17.

[15] *Id*. (emphasis omitted).

[7-9] When interpreting a statute, the starting point and focus of the inquiry is the meaning of the statutory language, understood in context.[16] Our analysis begins with the text, because statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.[17] Neither is it within the province of the courts to read meaning into a statute that is not there or to read anything direct and plain out of a statute.[18]

[10] Under § 28-318(8)(a)(iv), a victim does not consent to sexual penetration if "the consent, if any was actually given, was the result of the actor's deception as to the identity of the actor or the nature or purpose of the act on the part of the actor." The words of the statute thus impose two requirements to hold an actor responsible for sexual penetration of a victim. The actor must employ deception regarding either the identity of the actor or the nature and purpose of the act on the part of the actor. And the consent given, if any, must be the result of the deception. Here, there is no suggestion that there was any deception as to the identity of the actor; rather, the theory of deception focused on the nature and purpose of Anders' "treatment."

[11] Deception is not statutorily defined. Legal dictionaries have commonly defined "deception" as follows: "The act of deliberately causing someone to believe that something is true when the actor knows it to be false. . . . A trick intended to make a person believe something untrue."[19] But, more important, the word "deception," as used in § 28-318(8)(a)(iv), has a

---

[16] *State v. Taylor, supra* note 7.

[17] *Id.*

[18] *Id.*

[19] See, Black's Law Dictionary 510 (11th ed. 2019); "Deception," Merriam-Webster.com, https://www.merrriam-webster.com/dictionary/deception (last visited July 7, 2022) ("the act of causing someone to accept as true or valid what is false or invalid").

plain and ordinary meaning: words or conduct, or both words and conduct, causing the victim to believe what is false. This derives from two ordinary definitions. "[D]eception" is the "action of deceiving or cheating," the "fact or condition of being deceived," or "[t]hat which deceives; a piece of trickery; a cheat, sham."[20] "[D]eceive," in turn, is to "cause to believe what is false; to mislead as to a matter of fact, lead into error, impose upon, delude, 'take in.'"[21]

Here, Anders argues, it is "wholly unreasonable for an intelligent, emotionally, and socially well-adjusted high school student to believe in the early period of her weight training an obvious and self-serving lie by her trainer that digital sexual penetration would aid her recovery from workouts."[22] Thus, he continues, even if "it happened as she claims, [K.G.'s] belief in . . . Anders' statements [was] unreasonable."[23]

[12] In part, Anders' argument attempts to add words to § 28-318(8)(a)(iv). He invites us to insert a "reasonable reliance requirement" into the statute.[24] But in strictly construing penal statutes, an appellate court does not supply missing words or sentences to make clear that which is indefinite, or to supply that which is not there.[25] We decline Anders' request to read words into the statute.

Mainly, however, Anders invites us to reweigh credibility. He asks us to second-guess the trier of fact. Viewed in the light most favorable to the prosecution, the evidence shows that the first time that Anders sexually penetrated K.G., she was a young teenager under his tutelage. K.G. sought treatment for

---

[20] See "Deception," Oxford English Dictionary Online, https://www.oed.com/view/Entry/48134 (last visited July 7, 2022).

[21] See "Deceive," Oxford English Dictionary Online, https://www.oed.com/view/Entry/48096 (last visited July 7, 2022).

[22] Brief for appellant at 18.

[23] *Id.*

[24] See *id.*

[25] *State v. Johnson*, 310 Neb. 527, 967 N.W.2d 242 (2021).

pain she was suffering from training, and Anders had her lie down on a chiropractic bed at his gym. Anders then told K.G. that he needed to sexually penetrate her with his fingers to "adjust" her pelvis. Anders was 35 years her senior.

Anders occupied a position of trust, power, and authority over K.G. Could a reasonable fact finder conclude that Anders used that trust, power, and authority to cause K.G. to believe in something false, specifically, the nature and purpose of his act in penetrating her? In light of the evidence viewed most favorably to the prosecution, the question answers itself.

Moreover, Anders used deception for years to obtain K.G.'s consent and escalate the nature of the sexual penetration. Any time that K.G. protested being sexually penetrated, Anders deceptively stated that it was necessary for her "recovery" from her training. Then, K.G. would consent.

The court did not err in convicting Anders of first degree sexual assault. There was sufficient evidence to support Anders' conviction through the use of deception.

### b. Coercion

[13] Because we found that the evidence was sufficient to prove that Anders sexually penetrated K.G. through deception, we need not address this argument. Where there is sufficient evidence to support a conviction under one theory of guilt, an appellate court need not consider whether the evidence was sufficient to support the alternative theory or theories of guilt.[26]

## 2. INEFFECTIVE ASSISTANCE OF COUNSEL

### (a) Standard of Review

[14,15] When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from

---

[26] See *State v. McCurdy*, 301 Neb. 343, 918 N.W.2d 292 (2018).

the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.[27] The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question.[28]

[16-19] Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*,[29] the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.[30] To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.[31] To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.[32] In determining whether trial counsel's performance was deficient, there is a strong presumption that counsel acted reasonably.[33]

[20,21] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[34] Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court,

---

[27] *State v. Mrza, supra* note 3.

[28] *Id.*

[29] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[30] *State v. Mrza, supra* note 3.

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020).

an appellate court reviews the admissibility of evidence for an abuse of discretion.[35]

[22] Whether cumulative error deprived a criminal defendant of his or her Sixth Amendment right to a trial by an impartial jury presents a question of law to be reviewed de novo.[36]

### (b) Discussion

[23] We must address two preliminary matters. First, we emphasize that we restrict our analysis to only those errors that are assigned and specifically alleged. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.[37] Further, assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege deficient performance, and an appellate court will not scour the remainder of the brief in search of such specificity.[38]

[24] Anders does not limit his arguments regarding ineffective assistance of counsel to his assigned errors. Some of Anders' errors also lack the specificity we demand on direct appeal. We acknowledge that Anders filed his brief pro se. But a pro se party is held to the same standards as one who is represented by counsel.[39] Therefore, we only consider those arguments that are specifically raised in his assignments of error.

Additionally, while Anders' appellate counsel was different from his trial counsel, he does not specify in his assignments of error which trial counsel was ineffective. Technically, Anders' initial counsel, primary counsel, and postverdict counsel were all trial counsel.

---

[35] *Id.*

[36] *State v. Figures, supra* note 5.

[37] *State v. Wood*, 310 Neb. 391, 966 N.W.2d 825 (2021).

[38] *State v. Mrza, supra* note 3.

[39] *State v. Sellers*, 290 Neb. 18, 858 N.W.2d 577 (2015)*.*

Despite Anders' generality, we will consider his assignments of ineffective assistance of counsel, because we infer from the specific allegations of deficient performance that he is referring to his primary counsel. Anders' assignments of ineffective assistance of counsel discuss only pretrial and trial matters during which he was represented by primary counsel. For the remainder of our analysis, we will refer to Anders' primary counsel as "trial counsel."

*(i) Expert Testimony Regarding Coercion*

Anders assigns that his trial counsel was ineffective by failing to "insist upon expert testimony as to psychological coercion." We read this assignment of error as recasting Anders' sufficiency of the evidence argument regarding psychological coercion into an effective assistance of counsel claim.

Anders' assignment lacks merit, because his trial counsel objected to the sufficiency of the evidence by moving to dismiss the charge against Anders after the State completed its presentation of evidence. Further, we found the evidence sufficient to convict Anders—albeit under a different theory of guilt. Therefore, Anders' trial counsel was not deficient for failing to "insist" on expert testimony regarding psychological coercion.

*(ii) Deception*

Anders assigns that his trial counsel was ineffective by "[f]ailing to argue [sic] reliance upon deception as to the nature or purpose of a sexual act must be objectively reasonable." For almost identical reasons as the previous assignment, we find Anders' assignment lacks merit. Anders' trial counsel did object, and we have found sufficient evidence supporting the theory of deception.

*(iii) Hearsay*

Anders assigns that he received ineffective assistance of counsel, because his trial counsel did not object to "inadmissible single, double, and triple hearsay." Anders' assignment of

error does not allege what specific testimony his trial counsel should have objected to as inadmissible hearsay. This court shall not scour Anders' brief to rectify his lack of specificity. Therefore, we will not address this claim of ineffective assistance of counsel.

### (iv) M.C.

Anders assigns that his trial counsel was ineffective by failing to object to M.C.'s testimony at trial for being "an allegedly prior bad act that was dissimilar, did not constitute a crime of sexual assault under [§] 27-413 . . . , and was unduly prejudicial under [§] 27-403." Although Anders cites to Neb. Rev. Stat. § 27-413 (Reissue 2016), that section provides a definition pertinent to § 27-414—the section authorizing evidence of similar crimes in sexual assault cases. We understand Anders' argument to rely on the latter section.

Pursuant to § 27-414, evidence of the accused's prior commission of another offense of sexual assault is admissible if there is clear and convincing evidence that the accused committed the other offense.[40] Section 27-414 requires a hearing outside the presence of the jury before the court admits such evidence.[41] Subsection (3) of the statute also mandates:

> At the hearing, the rules of evidence shall apply and the court shall apply a section 27-403 balancing and admit the evidence unless the risk of prejudice substantially outweighs the probative value of the evidence. In assessing the balancing, the court may consider any relevant factor such as (a) the probability that the other offense occurred, (b) the proximity in time and intervening circumstances of the other offenses, and (c) the similarity of the other acts to the crime charged.[42]

---

[40] See *State v. Valverde*, 286 Neb. 280, 835 N.W.2d 732 (2013).

[41] See *id.*

[42] See § 27-414(3).

At the § 27-414 hearing, M.C. testified that Anders deceived her, ran his fingers up her thigh to her pelvic area, and "swirled his hands all over [her] breasts." These actions constituted third degree sexual assault.[43]

The court issued a written order, overruling Anders' objection and allowing M.C. to testify at trial. The court conducted a § 27-403 balancing test and considered the factors in § 27-414(3). The court found that there was clear and convincing evidence "the incident [M.C.] testified about occurred," noted that it occurred during the same period the State alleged that Anders sexually assaulted K.G., and noted that "both [M.C. and K.G.] allege that [Anders] told them that he would need to penetrate their vagina in order to properly adjust them."

Anders' trial counsel was not ineffective for failing to renew his objection to M.C.'s testimony under § 27-414, because it would have been futile to do so. The court did not abuse its discretion in allowing M.C. to testify at trial, and the record does not support the notion that the court would have reversed its ruling.

### (v) Ex-Business Partner

Anders assigns that he received ineffective assistance of counsel because his trial counsel "[f]ail[ed] to impeach [his ex-business partner] about his previous felony convictions, to object to his testimony as improper evidence of prior bad acts, to object to defense witnesses being questioned about [his] testimony, and the financial windfall [he] would derive from [Anders'] being convicted." This assignment features four claims. We will address them in turn.

### a. Felony Convictions

Anders argues that his trial counsel was ineffective because he did not impeach his ex-business partner for having previous

---

[43] See, § 27-414(1); § 28-318(5); Neb. Rev. Stat. § 28-320(1) (Reissue 2016).

felony convictions. The record is sufficient to address this claim, but Anders' argument lacks merit.

Anders' trial counsel questioned Anders' ex-business partner and revealed that he was "arrested for a crime and actually incarcerated between 2011 and 2015" and was, at one point, on "work release" when working for Anders. Therefore, Anders' trial counsel was not deficient regarding his "[f]ailure to impeach [his ex-business partner]."

### b. Prior Bad Act

Anders also argues his trial counsel should have objected to his ex-business partner's testimony that he saw Anders kiss K.G., because it was inadmissible evidence of a prior bad act under § 27-414. The record is insufficient to address this assignment.

[25-27] The decision whether or not to object has long been held to be part of trial strategy.[44] When reviewing claims of alleged ineffective assistance of counsel, trial counsel is afforded due deference to formulate trial strategy and tactics.[45] There is a strong presumption that counsel acted reasonably, and an appellate court will not second-guess reasonable strategic decisions.[46]

The record is devoid of evidence that would allow us to determine whether Anders' trial counsel chose to not object to Anders' ex-business partner's testimony regarding the kiss as part of a trial strategy. Therefore, the record is insufficient to adequately review this claim of ineffective assistance of counsel.

### c. Defense Witnesses

Anders presents no argument to support his claim that his trial counsel was ineffective for failing to object to defense

---

[44] See *State v. Huston*, 291 Neb. 708, 868 N.W.2d 766 (2015).

[45] See *id.*

[46] *Id.*

witnesses' being questioned about the ex-business partner's testimony. Therefore, we will not consider this claim of ineffective assistance of counsel.

### d. Financial Motives

Finally, Anders argues that his trial counsel was ineffective for questioning his ex-business partner regarding any financial motives for testifying. Anders attempts to support this argument by reference to materials entirely outside the record. While Anders sufficiently alleges this portion of his assignment of error, the record is insufficient for this court to address this claim of ineffective assistance of counsel.

### (vi) Text Messages

Anders assigns that his trial counsel was ineffective for "[f]ailing to object to inadmissible text messages from [Anders'] and [K.G.'s] cell phones." Anders does not specify in what manner the text messages were inadmissible in his assignment of error. Therefore, this claim of ineffective assistance of counsel lacks the specificity required for this court to address it.

### (vii) K.G.'s Statements

Anders assigns that his trial counsel was ineffective for "[f]ailing to cross-examine [K.G.] about the inconsistent time periods of [his] alleged misconduct between her trial testimony and previous sworn statements." The previous sworn statements that Anders cites are K.G.'s deposition for his trial and an affidavit she attached to her petition to seek a protection order against him. Anders claims "[K.G.] was clear no sexual penetration of her by [Anders] occurred before her 16th birthday, and that all incidents occurred inside [his] gym."[47]

Anders' trial counsel was not deficient for not cross-examining K.G. about her statements in her deposition because

---

[47] Brief for appellant at 34.

they were not inconsistent with her trial testimony. In her deposition, K.G. testified, "That adjustment where he stuck his fingers into my vaginal canal and adjusted my pelvis . . . occurred when I was fifteen . . . I remember the first time that had happened my mom came and picked me up." K.G. also testified that Anders and K.G. had "sexual relations" outside his gym—during their travels to weightlifting competitions.

However, the record is insufficient for this court to assess Anders' claim that K.G. made inconsistent statements in her protection order affidavit, because the affidavit is not in the record. Therefore, this court cannot address this portion of Anders' claim of ineffective assistance of counsel.

### (viii) K.G.'s Mental State

Anders assigns his trial counsel was ineffective for "[f]ailing to seek the counseling records of [K.G.'s therapist]" under *State v. Trammell*[48] "to cross examine [him] thereon, and to retain a defense expert to determine and testify if [K.G.] was suffering from false memory syndrome, and whether or not [K.G.'s] reliance upon any deception by [Anders] was reasonable and/or a result of psychological coercion." Anders argues that his trial counsel's failure to obtain K.G.'s counseling records prevented him from being able to sufficiently cross-examine her therapist and prove that her testimony was unreliable due to a mental condition.

Because Anders' trial counsel never filed a motion pursuant to *Trammell* and presented evidence under the established procedure, the record is insufficient for this court to assess whether his trial counsel was ineffective for failing to seek K.G's counseling records.[49] Consequently, we also cannot address Anders' claim that his trial counsel was ineffective for failing to cross-examine K.G.'s therapist and present expert testimony regarding K.G.'s mental state, because these claims

---

[48] See *State v. Trammell, supra* note 4.

[49] See *id.*

are conditioned upon his trial counsel's obtaining her counseling records. This court cannot address these claims based upon the record before us.

### (ix) Cumulative Error

[28] Anders concludes his assignments of error regarding ineffective assistance of counsel by arguing that the cumulative effect of his trial counsel's deficient performance resulted in cumulative error. We have recognized the doctrine of cumulative error in the context of a criminal jury trial.[50] Although one or more trial errors might not, standing alone, constitute prejudicial error, their cumulative effect may be to deprive the defendant of his or her constitutional right to a public trial by an impartial jury.[51]

[29] However, we note that in a case tried to the court without a jury, there is a presumption that the trial court, in reaching its decision, considered only evidence that is competent and relevant, and this court will not overturn such a decision where there is sufficient material, competent, and relevant evidence to sustain the judgment.[52] This presumption is a principle of appellate procedure which requires an appellant to show that the trial court actually used erroneously admitted evidence for the judgment or decision against the appellant.[53]

The doctrine of cumulative error does not support Anders' argument. The majority of Anders' claims of ineffective assistance of counsel are without merit or not sufficiently alleged. The remaining assignments of error, for which the record is insufficient to address in this direct appeal, cannot form the basis for a claim of cumulative error.[54]

---

[50] See *State v. Stelly*, 304 Neb. 33, 932 N.W.2d 857 (2019).

[51] See *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019).

[52] See *State v. Tomes*, 218 Neb. 148, 352 N.W.2d 608 (1984).

[53] See *State v. Lomack*, 239 Neb. 368, 476 N.W.2d 237 (1991).

[54] See *State v. Stelly, supra* note 50.

### 3. Sentence

Finally, Anders assigns that his sentence was excessive and unconstitutional. Anders' assignment lacks merit.

### (a) Standard of Review

[30] A sentence imposed within the statutory limits will not be disturbed on appeal in the absence of an abuse of discretion by the trial court.[55] We have already recited the definition of abuse of discretion.

### (b) Discussion

#### (i) Excessive

Anders asserts that his sentence of 25 to 30 years' imprisonment was clearly excessive. Anders argues the court improperly applied the well-established factors and applicable legal principles. We disagree.

Anders' sentence was within the statutory limits, and the court considered the well-established factors and applicable legal principles in its sentencing decision. As stated by the court, Anders used his "position of authority, command, influence" to "manipulate[] and isolate[]" a teenager into having sexual intercourse with someone 35 years her senior. Anders also showed no remorse for his actions.

The court's decision was not untenable, unreasonable, or clearly against justice or conscience, reason, and evidence. Therefore, Anders' sentence was not excessive.

#### (ii) Unconstitutional

Anders also challenges that his sentence is unconstitutional under art. I, § 9, of the Nebraska Constitution and the Eighth Amendment to the U.S. Constitution, which prohibit the infliction of cruel and unusual punishment. Anders argues that his sentence must be proportionate to others sentenced for similar crimes. Again, we disagree.

---

[55] *State v. Blake*, 310 Neb. 769, 969 N.W.2d 399 (2022).

[31] We have previously considered and rejected this broad proportionality claim.[56] The constitutional protection against cruel and unusual punishment does not require strict proportionality between crime and sentence, but, rather, forbids only extreme sentences that are grossly disproportionate to the crime.[57] The sentencing court was under no obligation to conduct a comparative analysis of similar cases—an inquiry that would be entirely impractical for trial courts to undertake.[58]

We find that Anders' sentence did not constitute cruel and unusual punishment. Anders' sentence properly reflected the seriousness of the crime committed and was proportionate for the offense and the offender.

## VI. CONCLUSION

There was sufficient evidence to support Anders' conviction for first degree sexual assault. Further, Anders did not receive an excessive sentence. Anders' ineffective assistance of counsel claims either lack merit or cannot be addressed on this record. We affirm Anders' conviction and sentence.

Affirmed.

---

[56] See State v. Jones, 297 Neb. 557, 900 N.W.2d 757 (2017).

[57] See *id.*

[58] See *State v. Morton*, 310 Neb. 355, 966 N.W.2d 57 (2021).