IN THE NEBRASKA COURT OF APPEALS

# MEMORANDUM OPINION AND JUDGMENT ON APPEAL
## (Memorandum Web Opinion)

STATE V. FIGUEROA

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

OSCAR A. FIGUEROA, APPELLANT.

Filed January 7, 2025.    No. A-23-634.

Appeal from the District Court for Douglas County: JAMES M. MASTELLER, Judge. Affirmed.

Jason E. Troia, of Dornan, Troia, Howard, Breitkreutz, Dahlquist & Klein, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and Jacob M. Waggoner for appellee.

RIEDMANN, Chief Judge, and MOORE and BISHOP, Judges.

MOORE, Judge.

## I. INTRODUCTION

Oscar R. Figueroa appeals his conviction and sentence for three counts of first degree sexual assault of a child following a jury trial in the district court for Douglas County. Figueroa claims that the district court erred in failing to properly manage the jury; failing to grant his motions for a mistrial; finding sufficient evidence to support his convictions; failing to grant his motion for a new trial; and imposing an excessive sentence. Figueroa also claims that he received ineffective assistance of counsel in several regards. For the reasons contained herein, we affirm.

- 1 -

## II. STATEMENT OF FACTS

### 1. CHARGES

This case arises from allegations of sexual assault against Figueroa made by D.G., Figueroa's stepdaughter.

On April 7, 2021, Figueroa was charged by information with one count of first degree sexual assault of a child, a Class IB felony in violation of Neb. Rev. Stat. § 28-319.01(1)(a) (Reissue 2016). On March 9, 2022, the State filed an amended information, charging Figueroa with five counts of first degree sexual assault of a child.

### 2. TRIAL

A jury trial was held over 7 days in January 2023. Additional details of the trial evidence are referenced as necessary in our analysis.

#### (a) Issues With Jury

During voir dire, a juror, G.J., stated that he knew a witness, Jennifer Olsen, because his wife worked as a paraprofessional at the same school as Olsen. He indicated that he knew her socially and that at times Olsen would discuss issues with her students. When asked if his relationship with Olsen would influence his decision as a juror, G.J. answered, "[p]robably not." No motion to strike G.J. was made during voir dire.

On the morning of the second day of trial, prior to the presentation of evidence and outside the presence of the jury, the State informed the district court about a recent conversation between a witness, Jennifer Olsen, and the wife of G.J. G.J. had alerted the bailiff to the conversation. Olsen informed the State that she and G.J.'s wife had spoken the prior day about Olsen seeing G.J. at the courthouse and wondering if he would be a juror in the case. Olsen denied that she and G.J.'s wife had spoken specifically about the case, rather G.J.'s wife asked Olsen if she was "done with court yesterday," and Olsen answered that she had been excused but had to come back.

The district court conducted an in camera interview of G.J. During the interview, G.J. stated that Olsen told his wife that she had seen him outside of the courtroom the day prior. G.J. denied that he had spoken with anyone about his jury service. He estimated that he and his wife socialized with Olsen twice a year. G.J. denied ever socializing with Olsen alone and stated that he did not consider Olsen "my close friend." G.J. did note that the previous night his wife had told him, "I think I know what case you're on." The court reread G.J. an instruction prohibiting discussion of the case and the G.J. affirmed that he could follow the instruction.

Figueroa moved to "strike" G.J. based on his personal relationship with Olsen. The district court denied the motion, finding that, after observing G.J.'s demeanor, G.J. was capable of following the court's instructions.

On the fourth day of trial, during the State's presentation of evidence, defense counsel requested a sidebar and informed the district court that G.J. was reading a message on his smartwatch. The court told defense counsel that it would again read the instruction previously read for the jury; that the jurors were not to have access to their cellphones during the proceedings, and the court would add that smartwatches were to be treated as cellphones. Defense counsel noted that he wanted to ensure that the jurors were listening to the testimony and to "make that record"

of G.J.'s smartwatch use. Immediately after concluding the sidebar the court made the discussed admonition.

On the morning of the sixth day of trial, a sidebar conference was held where defense counsel noted for the record that "a juror in the back corner of the jury box has been completely sleeping pretty much the whole time." The juror was not identified by name. The district court thanked defense counsel for bringing the sleeping juror to the court's attention and recessed proceedings for a mid-morning break in an effort to "get the juror reenergized."

(b) Evidence Adduced

C.M., a 13-year-old, attended middle school with D.G. C.M. testified that students at their middle school each get their own iPad and email account. When students first received their iPads, it was explained to them that middle school administrators and teachers can investigate the students' email inboxes. In March 2021, C.M. was emailing with D.G. regarding why she was absent from school. C.M. testified that his teacher, Olsen, found an email from D.G. while looking through his email account.

Olsen testified that she is a math teacher at the middle school and had both C.M. and D.G. as students. Olsen confirmed that teachers have the ability to monitor their students' iPads and email accounts. In March of 2021, Olsen accessed C.M.'s email account and saw something "very concerning" in an email thread between C.M. and D.G.

After Olsen read a particular email, she spoke with Hoa Pham Lavender, the dean of students. Olsen forwarded the email thread from C.M.'s email account to Pham Lavender's email account and then called Child Protective Services, as was her duty as a mandatory reporter.

Pham Lavender identified the email thread Olsen forwarded to her in March 2021 and it was received into evidence. In the email from D.G. to C.M., D.G. stated, "I got raped."

Sonja Figueroa testified that she was married to Figueroa but was involved in divorce proceedings at the time of trial. She and Figueroa met in 2010 and began living together in 2011. Sonja has two daughters: D.G., from a previous relationship, and G.F., whose biological father is Figueroa. Sonja testified that D.G. was born in July 2009 and Figueroa in August 1979.

Sonja, Figueroa, and the two children have lived together in their current home since August 2018. During this time Sonja's relationship with D.G. was "somewhat strained" because D.G. wanted to spend more time with Figueroa than with Sonja. Sonja described D.G.'s relationship with Figueroa as "very close" and agreed that D.G. was a "daddy's girl." G.F. testified that she was closer to Sonja and D.G. was closer to Figueroa. Sonja estimated that from 2018 until March 2021, she was away from the family home two to three times a week, often with G.F. G.F. testified consistently. During these outings, D.G. was left at home with Figueroa.

Sonja testified that in 2019, when D.G. was 10 years old, D.G. reported inappropriate touching by Figueroa to Sonja. Sonja confronted Figueroa and informed him that he could no longer sleep next to the children. Sonja did not call the police or take D.G. to the doctor.

On March 23, 2021, D.G.'s middle school counselor called Sonja to report concerning information. The following day, Child Protective Services came to the family home. The next day, Sonja took D.G. and G.F. to Project Harmony for forensic interviews. Sonja testified that she did not instruct D.G. or G.F. on what to say in their interviews, rather she told them to tell the truth.

D.G. testified that she was 13 years old at the time of trial. Though Figueroa is not D.G.'s biological father, she testified that he had been like a father to her. D.G. testified consistently with Sonja, noting that she had been closer to Figueroa than Sonja and described their bond as "like a best friend relationship." D.G. likewise testified that Sonja would take G.F. out "quite a bit," leaving her home with Figueroa.

D.G. testified that Figueroa had touched her in ways that made her feel uncomfortable in the family's old apartment. D.G. described an incident that occurred when she was 8 years old or younger when she and Figueroa were in his bedroom, lying on the bed and watching videos on Figueroa's phone. At some point Figueroa pulled D.G.'s pants down, put two of his fingers in D.G.'s vagina, and started "moving it around." D.G. denied that Figueroa had digitally penetrated her vagina but stated that his hand had gone in "a little bit."

D.G. testified that when she was 8 or 9 years old, Figueroa was sleeping on a beanbag chair in his bedroom and D.G. was standing near him. Figueroa pulled D.G. onto the beanbag chair and spooned D.G., so that the two were laying on their sides with her back against his stomach. Figueroa pulled down D.G.'s pants and then grazed the area between the cheeks of her buttocks with his penis in "a back and forth movement." D.G. denied that Figueroa had penetrated her anus with his penis at that time.

D.G. testified that Figueroa continued touching her inappropriately, which later escalated to penetration. D.G. referred to four instances of sexual penetration when she was between the ages of 10 and 11, after the family had moved into their current home in 2018, though she was unable to remember the order of these incidents. All of these instances occurred when D.G. and Figueroa were home alone.

First, D.G. testified to an incident which occurred in the living room. Both Figueroa and D.G. were lying on the living room couch. After some time, Figueroa moved D.G. toward him, pulled down each of their respective pants, and penetrated D.G.'s vagina with his penis. D.G. recalled that this was the first time she had been penetrated by Figueroa. D.G. described the penetration as painful. After this incident occurred, D.G. went to the bathroom and saw that she had vaginal bleeding. While cleaning up in the bathroom, D.G. also saw "this clear stuff that looked very similar to slime [that] was almost, like, white, clear."

Second, D.G. testified to an incident which occurred in her bedroom. The two were "cuddling" on D.G.'s bed and later she was vaginally penetrated by Figueroa's penis and Figueroa made "the same in-and-out motion." D.G. testified that after this incident, she went into her bathroom to clean up and saw "the same type of goopy slime" coming from the inside of her vagina.

D.G. testified that Figueroa took naps with her "pretty frequently." The naps were always initiated by Figueroa when he and D.G. were home alone together. During some of these naps Figueroa touched D.G. in ways that made her feel uncomfortable, including instances of sexual penetration.

Third, D.G. testified to an incident that occurred in the basement. Again D.G. and Figueroa were home alone. Figueroa was watching something on his phone while sitting on a beanbag chair in the basement and gestured for D.G. to come sit with him on the chair. After a while Figueroa fell asleep and sometime later, he pulled down his pants and D.G.'s pants down to her knees.

Figueroa turned D.G. so that she was facing away from him, with his stomach against her back, and took his penis and "directly put it inside my butt."

D.G. testified that this incident was different from the time where Figueroa had put his penis between the cheeks of her buttocks, as this time it "actually went in [to D.G.'s anus]." She described the sensation as "a different kind of pain, but kind of similar" to the instances when Figueroa had penetrated her vagina.

D.G. testified that this incident ended when Sonja and G.F. arrived at home and opened the garage, which she and Figueroa were able to hear from the basement. D.G. testified that as soon as the garage door began to open, Figueroa removed his penis from her anus and turned away from her.

Lastly, D.G. testified to a specific incident of sexual touching that occurred in Figueroa and Sonja's bedroom. D.G. testified that she and Figueroa were lying on the bed. Figueroa began touching her breasts under her clothing before touching her vagina with his hands. D.G. testified that Figueroa's fingers moved the lips of her vagina and were "going in . . . a circle motion."

D.G. testified that Figueroa penetrating her vagina with his penis occurred more than the specific times that she had recalled at trial. D.G. estimated that Figueroa had subjected her to sexual contact "probably . . . once or twice a week" while living in the family's current home.

D.G. testified that there was a time at the family home when her sister, G.F., "kind of saw" Figueroa sexually assaulting her. G.F. testified that one time she had been walking to the bathroom on the second floor of the family home when she passed D.G.'s bedroom and observed D.G. and Figueroa taking a nap together. G.F. thought that it was unusual that Figueroa was not snoring, as he typically did when he slept. G.F. later said something to Sonja about Figueroa being in D.G.'s bedroom.

D.G. testified that she and her mother had a conversation about Figueroa's presence in her bedroom. D.G. stated that for a while after this conversation, the sexual contact stopped, and Figueroa told her that he could not go into her room and fall asleep anymore. D.G. testified that after some time, Figueroa ultimately resumed laying with her and making sexual contact.

D.G. denied having a fundamental knowledge of sex and testified that she had never witnessed her parents having sex or viewed pornography. D.G. also testified that the human growth and development class that she took in the fourth grade did not give specific details about sexual intercourse. D.G. testified consistently with C.M. regarding using her school-issued iPad to send C.M. an email which disclosed that Figueroa had subjected her to sexual contact.

D.G. testified regarding her forensic interviews at Project Harmony. In the first interview, she disclosed inappropriate touching by Figueroa, and while doing so, she was "probably the most uncomfortable [she had] ever been." D.G. testified that following her first interview at Project Harmony, she had a medical exam with a nurse. During the medical exam, she declined a genital exam because she was feeling uncomfortable and "really wanted to leave that place."

After her medical exam with the nurse, while in the waiting room with Sonja, D.G. told Sonja new details about the sexual contact that she had not previously shared before, including in her first forensic interview. D.G. stated that she told Sonja these additional details because she could see that Sonja was confused and hurt, and D.G. "wanted [Sonja] to understand that [she] truly was not lying about what happened. . ."

Katie Ozmun testified that she is a detective in the Child Special Victims Unit of the Omaha Police Department. Ozmun was involved in the investigation into D.G.'s allegations and testified that in D.G.'s first forensic interview, she made disclosures of sexual abuse and identified the perpetrator as Figueroa. Ozmun testified that it was brought to her attention that D.G. had made further disclosures to Sonja while in the waiting room, and that she and the multidisciplinary team at Project Harmony decided to conduct a second forensic interview that same day.

Ozmun testified that in D.G.'s second forensic interview, D.G. provided additional details about the sexual contact by Figueroa. Ozmun interviewed Sonja at Project Harmony and Sonja corroborated information provided by D.G. in her second forensic interview. Figueroa objected on the basis of speculation, foundation, and hearsay, which the district court overruled.

Ozmun decided to conduct a second interview of D.G. while she was still at Project Harmony because D.G. was "in a good state of mind." D.G. was not upset by the first interview and seemed willing to talk more with the interviewer. Ozmun went on to explain that if she and her team were to bring a child back in for another interview, "we want to be sure that the first interview didn't trigger something [upsetting] in the child . . . [as well as that] the behavior in the first interview indicated that the child was open and honest." Defense counsel moved to strike Ozmun's response, which the district court sustained and instructed the jury to disregard.

Defense counsel then called for a sidebar and noted that there was a motion in limine in place which barred referring to D.G. as a "victim," as had been done in some of Ozmun's testimony. The district court noted that it was concerned with Ozmun's use of the word "honest" and her appearing to comment on D.G.'s credibility. The State asserted that Ozmun was not referring specifically to D.G., but to a child at Project Harmony in general.

Defense counsel moved for a mistrial based on the use of "victim," "open," and "honest," to validate D.G. and the information she gave during her forensic interview, which the district court overruled. The court noted that it is inappropriate for a witness to comment on the credibility of another witness, but that the phrase "open and honest" had been used in the context of a longer answer. The court believed that the order to strike the testimony and the instruction to the jury to disregard the testimony at issue was "sufficient to cure the prejudice."

Following these additional disclosures to her mother, D.G. underwent a second forensic interview at Project Harmony. In the second interview, she described instances of sexual contact with Figueroa with greater specificity, including that the sexual contact by Figueroa included penetration, rather than only outward touching. D.G. did not share the additional details disclosed in her second forensic interview in her first forensic interview because she had felt uncomfortable and had not previously made any disclosures with such a level of detail. D.G. testified that everything she said in her second interview was from her own memory and was true. She also testified that Sonja did not tell her what to say in the second interview.

During cross-examination of D.G., defense counsel called for a sidebar and made a motion for mistrial. Defense counsel stated that D.G. mouthed something to the prosecutor and that the prosecutor had mouthed something back to D.G. The prosecutor stated that D.G. had mouthed "break" to the prosecutor and that the prosecutor mouthed back, "I can't," and shook her head no. The district court overruled the defendant's motion and Figueroa's cross-examination of D.G. resumed.

Janessa Michaelis is a forensic interviewer at Project Harmony. On March 24, 2021, Michaelis interviewed G.F. once and D.G. twice. Michaelis was notified following D.G.'s first forensic interview that D.G. had additional disclosures to make and was ready to do so. Michaelis testified that D.G. was not forced to participate in a second interview.

Michaelis had reviewed a child abuse and neglect intake form with general information as to why D.G. was referred for a forensic interview but she only asked open-ended questions to avoid leading D.G. in her responses.

Michaelis testified that a child may delay disclosing a sexual assault for many reasons including age; gender; familial relationship or how close the alleged offender is to the victim; self-blame; concerns for judgment; cultural components or aspects; and cultural beliefs. If the alleged offender lives in the same home, it could serve to delay disclosure. Michaelis noted that delayed disclosures of sexual assault are more common than immediate disclosures and that disclosures typically happen in "bits and pieces over time."

Michaelis stated that some children will test disclosures, especially if they are unsure as to how someone is going to react or if they are still contemplating whether they want to tell or not. These children might give that "little piece of disclosure or that little piece of information" to see how their audience reacts and then decide if they are going to continue to disclose or not.

Michaelis had no concerns that D.G. had been coached or was suggestible during either of her forensic interviews. During Michaelis' testimony, both of D.G.'s forensic interviews were published for the jury. Consistent with D.G.'s testimony, in her first interview she describes the sexual contact with Figueroa as over her clothes or on the outside of her body and in her second interview she describes instances of vaginal and anal penetration.

Michaelis testified that D.G. and G.F. had differing versions of what seemed to be the same event. In D.G.'s interview, she stated that G.F. came into D.G.'s bedroom, turned on the light, and saw Figueroa on top of D.G. In G.F.'s interview, she stated that she went into D.G.'s room, turned on the light, saw that D.G. was on the phone, and G.F. told Sonja and got D.G. in trouble.

Kristina Johnson, a nurse practitioner at Project Harmony, conducted two forensic medical exams of D.G. on March 24, 2021. D.G. was making a historical report, meaning the alleged assault had occurred prior to the last 72 hours. Johnson testified that she did not collect evidence in her exams and that based on D.G.'s disclosures while at Project Harmony, she did not expect to. Figueroa objected based on Johnson testifying to her expectations, which the district court overruled, allowing the answer to stand.

Johnson testified that in her first forensic medical exam of D.G., D.G. disclosed "bad touches" to Johnson. D.G. described Figueroa touching her breasts over her clothes "pretty much any time he falls asleep in my room." D.G. initially denied that Figueroa had made contact with her vagina but disclosed that Figueroa had "touched" her on the outside of her clothed buttocks with his penis. When Johnson asked clarifying questions, D.G. then stated that "it was kind of in my hole." D.G. also told Johnson that her sister, G.F., had seen Figueroa making sexual contact with her and that G.F. had informed Sonja.

After the first medical exam was completed, Johnson offered D.G. a genital exam, which she declined. Johnson was asked if it was surprising to have a child over the age of 8 decline a genital exam, and she stated that she was not surprised. Figueroa made a relevancy objection which the district court overruled.

Johnson testified that she was later informed that D.G. had made additional disclosures after her first interview, including instances of penile-vaginal penetration. Johnson also testified that in her second forensic medical exam of D.G., she asked D.G. if there was other "touching" that D.G. had not yet discussed, which D.G. affirmed. D.G. clarified that it was the same movement or motion that she had described earlier, but that both she and Figueroa were unclothed during the contact. D.G. told Johnson that the "touching" occurred on both her vagina and her buttocks and that Figueroa's penis had gone "inside" both areas. D.G. was unable to recall if she experienced pain or had any bleeding because the sexual contact had "been going on for a really, really long time." D.G. declined Johnson's second offer of a genital exam.

Ozmun interviewed Figueroa at Omaha Police Department Headquarters. Ozmun described Figueroa's demeanor during the interview as cooperative and calm, though at certain points of the interview he was shocked by Ozmun's questions. Figueroa denied D.G.'s allegations of sexual contact. Though as Ozmun began referencing the allegations, Figueroa crossed his arms and became more physically closed off to Ozmun. Ozmun was asked if, based on her experience, Figueroa's denial was unusual to her, to which she said it was not. Figueroa objected based on foundation and the district court overruled the objection.

Ozmun later accompanied the crime lab to the family home where she found items that corroborated information gathered during the investigation, such as the beanbag chair D.G. had described when disclosing a sexual assault in the basement. Ozmun did not collect any physical evidence. At trial she was asked if she expected to find any physical evidence, to which she responded she did not. Figueroa objected based on the State leading the witness, which was overruled. Ozmun explained that the most recent sexual assault was alleged to have occurred weeks prior, thus decreasing the likelihood of recovering physical evidence. Additionally, D.G. and Figueroa lived together and so their DNA would have been present in many locations in the family home.

Ozmun later obtained a search warrant for Figueroa's blood for the purpose of investigating whether he would test positive for herpes. Figueroa's positive herpes test result was received into evidence.

A urologist who examined Figueroa in February 2012 testified that Figueroa had presented with a rash and pain in his penis. After further testing, the urologist diagnosed Figueroa with genital herpes, a permanent condition.

An infectious disease expert testified regarding blood tests results for Figueroa, Sonja, and D.G. Figueroa and Sonja were both positive for one type of herpes and D.G. was negative for both types of herpes. Further, the expert testified that the test results did not conclusively prove or disprove a sexual relationship between Figueroa and D.G.

Following the presentation of evidence, the State moved to dismiss the fifth count of first degree sexual assault of a child of the second amended information, which motion was sustained, and an order dismissing the count was later filed.

### 3. VERDICT

During deliberations, the jury sent the district court a note that read:

> When deciding on each count, does our sheet match what the State presented in closing as

Count 1 - Penile-vaginal penetration on the living room couch
Count 2 - Penile-vaginal penetration in D.G.'s bedroom
Count 3 - Penile-anal penetration on the beanbag chair in the basement
Count 4 - Digital-vaginal penetration in the defendant's bedroom.

After consulting with the parties, the district court referred the jury back to the court's original jury instructions, which provided identical elements for each of the four counts, but did not identify the alleged locations of the incidents.

The jury returned unanimous verdicts of guilty as to counts I, II, and IV, and not guilty as to count III. The district court accepted the jury's verdicts as to counts I, II, and IV, finding Figueroa guilty, and dismissing the charge in Count III.

### 4. MOTION FOR NEW TRIAL

On February 9, 2023, Figueroa filed a motion for a new trial. The motion alleged that a juror was sleeping during the proceedings, the State had communicated with D.G. during her cross-examination, and insufficient evidence for conviction entitled Figueroa to a new trial. On July 11, Figueroa filed a motion for leave to file a first amended motion for a new trial. In the amended motion, Figueroa sought to allege as an additional basis, the existence of new evidence that could not have been discovered with reasonable diligence prior to trial.

An evidentiary hearing was held on the matter in July 2023. Following argument, the district court denied Figueroa's motion for leave to file an amended motion for a new trial as it only asserted newly discovered evidence pertaining to the credibility of D.G.'s trial testimony.

Defense counsel testified that during direct examination of D.G., the prosecutor abruptly stopped and asked for a break, which led the defense counsel to suspect that the State and D.G. had developed a method of covert communication to be used during D.G.'s testimony. Defense counsel also testified that the prosecutor had pointed to specific areas of a visual aid containing a timeline when asking D.G. how old she would have been and in what grade, thus leading her testimony; the prosecutor had mouthed something to D.G. during her cross-examination; and the prosecutor had positioned herself between one of Figueroa's trial attorneys and D.G. which prevented defense counsel from seeing D.G. during her direct examination.

Defense counsel also made an offer of proof regarding the newly discovered evidence referenced in the motion for leave to file a first amended motion for a new trial. First, she had learned by reviewing the presentence investigation report (PSR) that D.G. had indicated Figueroa bit her on the vagina, leaving a scar. D.G. was asked during her deposition whether she and Figueroa had engaged in any oral sex and D.G. indicated that had not happened. Additionally, some of Figueroa's family members approached defense counsel after the trial had concluded and stated that there was someone seated directly in front of them that was helping D.G. answer questions on direct examination.

As an offer of proof, a victim advocate from the Douglas County Attorney's office testified that she had nodded her head yes or no during trial, including during D.G.'s testimony. The victim advocate explained that she did so to emotionally support D.G. and communicate that D.G. was doing fine and was safe. The victim advocate denied shaking or nodding her head to assist D.G. in her testimony or otherwise communicate agreement about the content of D.G.'s testimony.

Figueroa's brother testified that he had witnessed the victim advocate nodding while D.G. was having difficulty answering questions during her testimony. The brother also observed the victim advocate using hand signals when D.G. was struggling in her testimony, such as the victim advocate placing both hands on her chest in a sign of "we got you[.]"

The brother also briefly testified to observing a juror fall asleep during the proceedings. The brother estimated that the juror had been asleep for approximately 5 minutes.

The district court denied Figueroa's motion for a new trial in an order entered on July 17, 2023. The court found that all of Figueroa's arguments regarding alleged communication and coaching during D.G.'s trial testimony by the State went to the credibility of D.G.'s trial testimony, which cannot form the basis for a new trial. The court also observed that "these are all matters that occurred in open court and in full view of the jury." The court further found that to the extent a juror "momentarily" fell asleep during the extended trial, it was not so prejudicial that Figueroa was denied a fair trial.

### 5. SENTENCING

On July 17, 2023, the district court sentenced Figueroa to 35 to 45 years' imprisonment on each of counts I, II, and IV, to be served concurrently. Figueroa was given 846 days credit for time served.

Figueroa appeals.

## III. ASSIGNMENTS OF ERROR

Figueroa assigns, consolidated and restated, that the district court erred in (1) failing to properly manage the jury, (2) failing to grant his motions for a mistrial, (3) finding sufficient evidence to support his convictions, (4) failing to grant his motion for a new trial, and (5) imposing an excessive sentence. Figueroa also assigns (6) that he received ineffective assistance of counsel in several regards.

## IV. ANALYSIS

### 1. JUROR ISSUES

Figueroa alleges that the district court erred in managing the jury in two regards: by not "striking" a juror for cause due to having a relationship with a witness, and in "outing defense counsel to the same juror." Brief for appellant at 10.

The retention or rejection of a juror is a matter of discretion for the trial court, and this rule applies both to the issue of whether a venireperson should be removed for cause and to the situation involving the retention of a juror after the commencement of trial; thus, the standard of review in a case involving discharge of a juror is whether the trial court abused its discretion. *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021).

#### (a) Juror With Relationship to Witness

Figueroa argues that because G.J. had a personal relationship with Olsen and both Olsen and G.J.'s wife had interacted with D.G. at her school, G.J.'s connections inhibited him from being objective and giving Figueroa a fair trial. As there were two alternate jurors available, Figueroa

contends that it was an abuse of discretion by the district court to deny Figueroa's motion to strike G.J.

We briefly note that because Figueroa's motion to discharge G.J. came after the jury had been sworn, to the extent he refers to "striking" G.J. from the jury panel, the terminology is imprecise. See *State v. Huff*, 298 Neb. 522, 905 N.W.2d 59 (2017).

Neb. Rev. Stat. § 29-2004(2) (Reissue 2016) authorizes a court to disqualify a juror for cause after the juror has been sworn in. Section 29-2004(2) does not identify the reasons for which a juror might be discharged. Where the jury misconduct in a criminal case involves juror behavior only, the burden to establish prejudice rests on the party claiming misconduct. See *State v. Huff, supra*.

In the district court's in camera interview of G.J., G.J. stated that he had not spoken to anyone regarding his jury service. G.J. denied discussing the case with his wife, and that while he and his wife did socialize with Olsen a few times a year, he did not consider Olsen to be a close friend. The court instructed G.J. that he was not to discuss the case with anyone, and G.J. confirmed that he was able to follow the instruction. After observing G.J., the court found that he was capable of following the court's instructions.

Figueroa did not demonstrate that G.J. was biased, engaged in misconduct, or was otherwise unfit to serve on the jury. Rather, G.J. followed the district court's instructions by alerting the bailiff about his conversation with his wife regarding Olsen. G.J. had also disclosed his connection to Olsen during voir dire. The district court did not abuse its discretion in denying Figueroa's motion to discharge the juror. This assignment of error fails.

### (b) Timing of Court's Admonition

Figueroa next alleges that the district court erred in admonishing the jury regarding smartwatch use after defense counsel called a sidebar to report G.J. using a smartwatch. Figueroa asserts that "being tattled on was prejudicial to Figueroa's case." Brief for appellant at 26. Figueroa contends that because there had already been issues with G.J. as a juror, the district court should have waited until a regular break or a repeat incident to address G.J.'s smartwatch use.

We find the district court's admonition, that smartwatches were to be treated as cellphones and that the jurors should not be accessing them in any way during the proceedings, to be appropriate. We decline to find the court's admonition to be in any way prejudicial to Figueroa. This assignment of error fails.

### 2. MOTIONS FOR MISTRIAL

Figueroa alleges that the district court erred in denying his two motions for mistrial. An appellate court will not disturb a trial court's decision whether to grant a motion for mistrial unless the court has abused its discretion. *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021). A mistrial is properly granted in a criminal case where an event occurs during the course of trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *Id*.

A defendant faces a higher threshold than merely showing a possibility of prejudice when attempting to prove error predicated on the failure to grant a mistrial. *State v. Trail*, 312 Neb. 843,

981 N.W.2d 269 (2022). The defendant must prove that the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice. *Id.*

### (a) State's Communication With D.G.

Figueroa's first motion for mistrial occurred after the State communicated with D.G. during her cross-examination. During Figueroa's cross-examination of D.G., defense counsel called for a sidebar and made a motion for mistrial. Defense counsel stated that D.G. mouthed something to the prosecutor and that the prosecutor had mouthed something back. The prosecutor stated that D.G. mouthed "break" to the prosecutor and that the prosecutor mouthed back "I can't." Figueroa contends that this prejudiced him by disrupting the flow of cross-examination.

We do not find that this brief disruption in Figueroa's cross-examination of D.G. created such a damaging effect as to prevent a fair trial. See *State v. Figures, supra*. Defense counsel was able to immediately resume cross-examining D.G. and was given sufficient time to complete the questioning. Our record also reflects that several side bars were taken during Figueroa's cross-examination of D.G. by both the prosecution and defense.

This assignment of error fails.

### (b) Ozmun's Testimony

Figueroa's second motion for mistrial occurred during Ozmun's testimony about the decision to conduct a second forensic interview of D.G. Ozmun testified that D.G. underwent a second forensic interview at Project Harmony because she was "in a good state of mind." Ozmun testified that being "in a good state of mind" includes being "open and honest." Defense counsel moved to strike Ozmun's response, which the district court sustained and then instructed the jury to disregard. During a sidebar the district court noted that it was concerned with Ozmun's use of the word "honest" in describing D.G.'s interview but denied Figueroa's second motion for mistrial.

Figueroa asserts that since a second forensic interview of D.G. occurred, Ozmun's testimony insinuated that D.G. was open and honest. Figueroa argues that "[t]he bell could not be unrung on this one and it was an abuse of discretion to deny the mistrial." Brief for appellant at 28.

Absent evidence to the contrary, the legal system presumes that jurors, to the extent they are able, will comply with curative instructions and judicial admonitions. See *State v. Trail, supra*.

Here, the district court instructed the jury to disregard Ozmun's testimony that being "in a good state of mind" includes being "open and honest." The court noted during the sidebar that it believed that the order to strike the testimony and instructing the jury to disregard the testimony was "sufficient to cure the prejudice." The jury is presumed to have complied with the curative instruction, and Figueroa has failed to prove that the alleged error actually prejudiced him. This assignment of error fails.

### 3. SUFFICIENCY OF EVIDENCE

Figueroa challenges the sufficiency of the evidence used to convict him of three counts of first degree sexual assault of a child.

One is guilty of first degree sexual assault of a child under § 28-319.01(1)(a) "[w]hen he or she subjects another person under twelve years of age to sexual penetration and the actor is at

least nineteen years of age or older[.]" "Sexual penetration" is defined under Neb. Rev. Stat. § 28-318(6) (Cum. Supp. 2022) to include, "any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body." In reviewing a criminal conviction for a sufficiency of the evidence claim the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *State v. Bryant*, 311 Neb. 206, 971 N.W.2d 146 (2022).

D.G. testified that when she was between the ages of 10 and 11, Figueroa once digitally penetrated her vagina and twice penetrated her vagina with his penis. Sonja testified that D.G. was born in July of 2009, and that Figueroa's birthday is August 1979, making him approximately 40 and 41 years old during the period D.G. described.

Figueroa does not argue that D.G.'s testimony, if believed, would not support a finding that he had sexually assaulted D.G. Instead, he attacks D.G.'s credibility.

Figueroa argues that the evidence demonstrating that he had herpes and D.G. did not; D.G.'s and G.F.'s differing accounts during their forensic interviews of the time that G.F. saw Figueroa in D.G.'s bedroom; D.G.'s refusal of genital exams at Project Harmony; and the difference in D.G.'s disclosures between her first and second forensic interview, cast reasonable doubt on D.G.'s testimony. Figueroa contends that "[a]ll the State was able to offer was the word of D.G. that Figueroa subjected her to penetration." Brief for appellant at 30.

The State is not required to corroborate a victim's testimony in cases of first degree sexual assault; if believed by the finder of fact, the victim's testimony alone is sufficient. *State v. Anders*, 311 Neb. 958, 977 N.W.2d 234 (2022). The jury clearly made an implicit credibility finding when it found Figueroa guilty of three counts regarding D.G. In reviewing a conviction for sufficiency of the evidence, we do not pass on the credibility of witnesses and instead we recognize that it is a matter for the fact finder. See *State v. Mueller*, 301 Neb. 778, 920 N.W.2d 424 (2018).

Viewing the evidence in this case in the light most favorable to the prosecution, we conclude that the jury could have found the elements of first degree sexual assault of a child had been proved beyond a reasonable doubt for three counts. This assignment of error fails.

### 4. MOTION FOR NEW TRIAL

Figueroa next assigns that the district court erred in not granting his motion for a new trial. Figueroa asserts that he offered evidence that a victim advocate was shaking her head and nodding during D.G.'s testimony. He also points out that D.G. indicated to the probation officer compiling the PSR after trial that Figueroa had permanently scarred her vagina, contradicting her deposition testimony. Figueroa argues that this newly discovered evidence "could have been examined to refute the everchanging story from D.G.," and that the denial of his motion for a new trial amounted to a due process violation. Brief for appellant at 31.

The standard of review for a trial court's denial of a motion for new trial after an evidentiary hearing is whether the trial court abused its discretion in denying the motion. *State v. Blocher*, 313 Neb. 699, 986 N.W.2d 275 (2023). To warrant a new trial, newly discovered evidence must involve something other than the credibility of the witness who testified at trial. *State v. Worthman*, 311 Neb. 284, 971 N.W.2d 785 (2022).

We note that the newly discovered evidence argued by Figueroa was included in his amended motion for a new trial, which the district court did not allow to be filed. As the district court found in its order denying Figueroa's motion for leave to an amended, Figueroa's arguments regarding alleged coaching by the victim advocate during D.G.'s trial testimony and inconsistencies between the PSR and her testimony went to the credibility of D.G.'s trial testimony, which cannot form the basis for a new trial. The district court did not abuse its discretion in denying Figueroa leave to amend or the original motion and this assignment of error fails.

5. EXCESSIVE SENTENCE

Figueroa assigns that the district court abused its discretion when it imposed an excessive sentence.

A sentence imposed within statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court. *State v. Alkazahy*, 314 Neb. 406, 990 N.W.2d 740 (2023). An abuse of discretion takes place when the sentencing court's reasons or rulings are clearly untenable and unfairly deprive a litigant of a substantial right and a just result. *Id*.

In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id*. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*. See, also, *State v. Rogers*, 297 Neb. 265, 899 N.W.2d 626 (2017) (sentencing court is accorded very wide discretion in imposing sentence).

Figueroa was convicted of three counts of first degree sexual assault of a child, a Class IB felony, which is punishable by up to life imprisonment with a mandatory minimum of 15 years' imprisonment. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2022). Figueroa's sentence of 35 to 45 years' imprisonment on each of the three counts, to be served concurrently, is within the statutory limits.

Figueroa nevertheless claims that the district court abused its discretion, arguing that he had minimal criminal history and scored very low on assessments used to screen his risk to recidivate.

The PSR shows that Figueroa was 43 years old at the time the report was prepared and had completed high school. Prior to the charges at issue in this case, Figueroa had one traffic violation for speeding in 2010, which had been dismissed. Figueroa was assessed under the Vermont Assessment of Sex Offender Risk tool and scored as a low risk to recidivate. Figueroa also scored as a medium low risk to reoffend on the overall Level of Service/Case Management Inventory assessment.

At the sentencing hearing, the district court indicated that it had reviewed the PSR and all statutory factors as they related to Figueroa. The district court explicitly referenced the mitigating factors argued by Figueroa on appeal. The court also noted that throughout his PSR interview, Figueroa "adamantly denied he sexually assaulted his stepdaughter." Additionally, the court

- 14 -

referenced the PSR's discussion that a history of abuse places D.G. at significant risk for long-term mental health and physical health complications.

We find no abuse of discretion by the district court in the sentence imposed.

## 6. Ineffective Assistance of Counsel

Finally, Figueroa alleges that his trial counsel was ineffective in four regards. We first set out the applicable law before addressing each claim in turn.

### (a) Legal Framework

Whether a claim of ineffective assistance of counsel may be determined on direct appeal is a question of law. *State v. Miranda*, 313 Neb. 358, 984 N.W.2d 261 (2023). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id*.

An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court. *Id*. When a claim of ineffective assistance of counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel. *Id*.

Once raised, an appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *Id*.

When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. *Id*.

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Miranda, supra*. To show that counsel's performance was deficient, the defendant must show counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. To show prejudice under the prejudice component of *Strickland*, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different. *State v. Miranda, supra*.

### (b) Failure to Object to "Evidence of No Evidence"

Figueroa alleges that his trial counsel was ineffective for failing to object to the State's offer of "evidence of no evidence in its case in chief" based on relevance and evidence rule 403.

Brief for appellant at 37. Figueroa argues that the State's examination of Ozmun regarding Figueroa's denial during his police interview, and the examination of both Ozmun and Johnson regarding their expectation of recovering physical evidence, resulted in unfair prejudice, and that "[t]he witnesses' opinions and presence or absence of surprise or expectations were sought as an excuse for there not being evidence." Brief for appellant at 38.

We first note that Figueroa's trial counsel did object to all the testimony referenced in his argument. We also find the testimony at issue to be highly relevant. Here, because D.G.'s allegations were historical reports of sexual assaults, Johnson's and Ozmun's testimony that the absence of physical evidence was expected in this case helped clarify for the jury why physical evidence was not found during D.G.'s medical exam or search of the family home. Their testimony also explains why physical evidence of sexual assault was not presented at trial. Ozmun's testimony that Figueroa's denial was not unusual contextualizes that behavior for the jury.

Additionally, Neb. Rev. Stat. § 27-403 (Reissue 2016) states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . ." Here, the testimony by Ozmun and Johnson merely explains the absence of evidence. We do not find that this relevant evidence was substantially outweighed by the danger of unfair prejudice.

Because Figueroa has failed to show that counsel's performance was deficient and he cannot establish prejudice by the admission of the complained of testimony, this assignment of error fails.

### (c) Failure to Object to Michaelis' Bolstering

Figueroa next alleges that his trial counsel failed to object to Michaelis' bolstering of D.G.'s testimony. He argues that the State improperly adduced evidence through Michaelis that implied D.G. had been truthful in her forensic interviews. Because his trial counsel failed to object to Michaelis' testimony that she did not have concerns that D.G. had been coached, coupled with the lack of evidence supporting D.G.'s allegations, Figueroa contends that he was prejudiced.

Neb. Rev. Stat. 27-608(1)(b) (Reissue 2016) provides that "evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise." We do not view Michaelis' testimony as constituting improper credibility bolstering. Rather, Michaelis testified that there were no "red flags or concerns" that suggested to her that D.G. had been coached in her interviews. Michaelis was not directly expressing an opinion regarding the truthfulness of D.G.'s allegations.

Figueroa's trial counsel was not deficient in failing to object to this testimony and Figueroa cannot establish that he was prejudiced by this testimony. This assignment of error fails.

### (d) Failure to Object to Ozmun's Bolstering

Figueroa alleges that his trial counsel was deficient for failing to object to Ozmun's bolstering of D.G.'s testimony. He argues that the State improperly adduced evidence through Ozmun that implied D.G. had been truthful in her forensic interviews based upon corroboration through Sonja. Again, because his trial counsel failed to object to Ozmun's testimony that Sonja had corroborated information in D.G.'s second forensic interview, coupled with the lack of evidence supporting D.G.'s allegations, Figueroa contends that he was prejudiced.

We do not find Ozmun's testimony constituted improper credibility bolstering. Ozmun was not expressing an opinion regarding the truthfulness of D.G.'s second forensic interview. Rather, she testified that the narratives provided by Sonja in her interview with Ozmun, and by D.G. in her second forensic interview, were consistent.

Figueroa's trial counsel was not deficient in failing to object to this testimony and he cannot establish prejudice from this testimony. This assignment of error fails.

### (e) Failure to Rehabilitate Defense Witness

Lastly, Figueroa alleges that his trial counsel was ineffective for failing to rehabilitate defense expert witness Dr. Aaron Pierce.

Pierce testified for the defense regarding his experience and education on deception detection, false allegations of sexual abuse, and his concerns following his review of the investigation in the case. On cross-examination, the State elicited testimony from Pierce that he was being paid approximately $16,000-$17,000 for his work on the case. The State also elicited testimony that Pierce gave the defense a list of questions about his background and "bullet points that were areas that [he] focused on in this case that the [defense] may want to ask about." Figueroa argues that his trial counsel was deficient in failing to rehabilitate Pierce and that his defense was prejudiced as a result.

On redirect examination, Figueroa's trial counsel asked Pierce whether his opinions were based on peer-reviewed, published studies, and whether those studies were still accurate at the time of trial, and Pierce answered in the affirmative. During closing argument, Figueroa's trial counsel once again highlighted Pierce's credentials and noted that there was "nothing illegal about hiring an expert."

Though Figueroa's trial counsel did not ask Pierce directly about his payment in relation to his testimony, trial counsel sufficiently rehabilitated Pierce with the line of questioning on redirect and argued his credibility in closing.

Figueroa's trial counsel was not deficient in failing to rehabilitate their expert witness and he cannot show prejudice as a result of this alleged failure. This assignment of error fails.

### V. CONCLUSION

Finding no error by the district court, we affirm Figueroa's conviction and sentence.

AFFIRMED.